# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1899

_____

United States of America

*Plaintiff - Appellee*

v.

Francisco Ortega-Montalvo, also known as Jerry Ortega

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: February 6, 2017
Filed: March 8, 2017

_____

Before RILEY, Chief Judge, SMITH and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Francisco G. Ortega-Montalvo was convicted of illegally re-entering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). The district court[1] sentenced him

_____

[1] The Honorable Beth Phillips, United States District Judge for the Western District of Missouri.

to 51 months' imprisonment. He appeals the denial of his motion to suppress. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

In 2011, Ortega-Montalvo, a Mexican citizen illegally in the United States, was convicted of aggravated assault after shooting at a police officer. In 2013, he was deported and prohibited from re-entering.

In 2014, the U.S. Department of Homeland Security Investigations (HSI) received a tip that Ortega-Montalvo illegally re-entered the United States and was working at Maria's Mexican Restaurant in Platte City, under the alias "Jerry Ortega." According to the tip, he drove a white pickup truck with the Arkansas license plate "087MID." Special Agent Scott Lindsey corroborated the tip, confirming that the Arkansas plate was registered to Francisco Ortega and that he had been deported after conviction for aggravated assault. Agents visited Maria's Mexican Restaurant and observed a white truck with the Arkansas license plate in the parking lot.

Based on the corroborated tip, information about Ortega-Montalvo's illegal status and criminal history, and an online database search revealing an apartment address in Platte City, Agent Lindsey and his supervisor decided to locate and arrest him. Officer Lindsey briefed a team of five HSI special agents and two Platte City police officers on Ortega-Montalvo's illegal status, physical description (including pictures), and criminal history of aggravated assault against a police officer.

The morning of the arrest, an HSI agent surveilled the apartment's parking lot, finding the white truck. An agent rang the apartment's doorbell from outside the apartment complex. HSI special agents Timothy Ditter and Tim Kixmiller, uniformed in protective armor with guns holstered, waited outside the door. An Hispanic male (not Ortega-Montalvo) opened the door "partially dressed," looking "like he had literally just gotten out of bed." The agents introduced themselves and displayed their badges. Determining that the man (later identified as Juan Maldonado), did not speak

-2-

English, Agent Ditter, fluent in Spanish, asked his country of citizenship and whether "he had documents to be in the United States." Maldonado replied he was a citizen of Mexico and did not have documents. Agent Ditter asked permission to enter the apartment to talk. Maldonado consented.

Inside, Agent Ditter asked if anyone else was present. Maldonado said his friend was there, pointing to the back of the apartment. Agent Ditter told Maldonado "we're going to do a protective search for everyone's safety." Maldonado said nothing. Special agent José Covarrubias, a native Spanish speaker who entered during the conversation, sat with Maldonado and questioned him.

With guns drawn, Agents Ditter and Kixmiller conducted a protective sweep, finding one bedroom door locked. They knocked on it. An Hispanic man identifying himself as Jerry Ortega opened the door. Immediately recognizing him as Ortega-Montalvo, they handcuffed him and placed him under arrest. The agents continued the protective sweep, finding no one else in the apartment.

After the protective sweep, the agents holstered their guns and asked Maldonado and Ortega-Montalvo—both handcuffed and under arrest—for consent to search the apartment. According to agents, both consented. In Ortega-Montalvo's bedroom, officers seized three identification documents. Officers took Ortega-Montalvo to the Enforcement Removal Operations Office, advised him of his *Miranda* rights, and took a written statement. In the statement, he admitted he was a citizen of Mexico who had been deported from the United States and re-entered illegally.

A grand jury indicted Ortega-Montalvo on one count of illegal re-entry. He moved to suppress all evidence and testimony from the search, arrest, booking, and questioning. At the suppression hearing, a magistrate judge heard testimony from Maldonado and HSI agents Lindsey, Ditter, and Covarrubias. Maldonado testified

he opened the door to police pointing guns at him; an officer grabbed him by the neck, pushed him against the wall, and entered the apartment without his permission. He denied that officers asked whether he had documentation to be in the country. Rejecting Maldonado's testimony as not credible, the magistrate judge concluded his consent was "given voluntarily and without coercion." Finding the protective sweep lawful, he recommended denying the motion. The district court adopted the recommendation. At a bench trial, it found Ortega-Montalvo guilty.

"On review of a motion to suppress," this court reviews "factual findings for clear error" and "legal conclusions *de novo*." ***United States v. Sigillito***, 759 F.3d 913, 923 (8th Cir. 2014), *quoting* ***United States v. Brooks***, 715 F.3d 1069, 1075 (8th Cir. 2013). This court affirms the denial unless it is "unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." ***United States v. Vanover***, 630 F.3d 1108, 1114 (8th Cir. 2011).

I.

Ortega-Montalvo argues that Maldonado did not voluntarily consent to the agents' entry into the apartment. At the suppression hearing, the magistrate judge rejected Maldonado's testimony on this issue, instead crediting the testimony of an HSI agent that Maldonado voluntarily consented to entry. The district court adopted the finding.

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." ***Schneckloth v. Bustamonte***, 412 U.S. 218, 227 (1973). *See* ***United States v. Sanders***, 424 F.3d 768, 773 (8th Cir. 2005) ("Whether consent is voluntarily given is a question of fact."). Evaluating consent, courts consider: (1) age; (2) general intelligence and education; (3) whether the person was

-4-

intoxicated at the time of consent; (4) whether the person consented after receiving *Miranda* rights; and (5) whether the person was aware of his or her rights and protections due to previous arrests. *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008). Other relevant factors include: (6) the length of detention time; (7) whether the officers acted in a threatening manner; (8) whether officers made any promises or misrepresentations; (9) whether the person was in custody or under arrest when giving consent; (10) whether the person consented in public; and (11) whether the person was silent as the search was conducted. *Id.* at 676-77. "Determination of consent necessarily involves judging the credibility of witnesses, a task generally left to the district court." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005). "A district court's credibility findings are well-nigh unreviewable, so long as the findings are not internally inconsistent or based on testimony that is incoherent, implausible, or contradicted by objective evidence." *Sigillito*, 759 F.3d at 923.

Here, there is no evidence that Maldonado's age, intelligence, or education inhibited his ability to voluntarily consent, or that he was intoxicated. He was not in custody, threatened, or made any promises or misrepresentations to obtain his consent. The agents introduced themselves, showed their badges, and requested, in Spanish, to enter the apartment. Their guns were holstered; they did not raise their voices. Ortega-Montalvo's assertion that Maldonado was "deliberately deceived" because the agents requested to "talk" rather than informing him they were searching for Ortega-Montalvo is without merit. There is no requirement that officers "gratuitously advertis[e] [their] every move to anyone [they] might encounter." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 835 (8th Cir. 2014) (alterations in original), *quoting United States v. Briley*, 726 F.2d 1301, 1305 (8th Cir. 1984). "Importantly, [Maldonado] agreed to let the agents inside without further inquiry as to the nature of the visit." *Id.* There was "nothing misleading about [the agents'] request to speak with [Maldonado] because it was consistent with the overall goal of locating [Ortega-Montalvo]." *Id.*

Maldonado's partial dress, lack of sleep, or admission that he was illegally in the United States also did not make the situation "inherently coercive" as Oretega-Montalvo asserts. *See United States v. Quintero*, 648 F.3d 660, 670 (8th Cir. 2011) (holding that a person's "subjective state of mind at the time he allegedly gave his consent is not determinative" and that "[t]he internal psychological pressure associated with a suspect's knowledge of his or her own guilt, or fears that evidence of such guilt has been discovered by police" does not bear on whether consent was voluntary); *United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010) (finding voluntary consent despite defendant's state of undress, noting that defendant "chose to open the door when he was not fully clothed"); *United States v. Mancias*, 350 F.3d 800, 805-06 (8th Cir. 2003) ("Although [defendant] was extremely tired at the time of his encounter with [law enforcement], we do not find [defendant's] physical state rendered his consent involuntary.").

The district court properly found Maldonado voluntarily consented to entry.

II.

Ortega-Montalvo contends that even if Maldonado consented to entry, the protective sweep exceeded the scope of consent and was unlawful.

"A protective sweep is permitted under the Fourth Amendment when an officer has 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Crisolis-Gonzalez*, 742 F.3d at 836, *quoting Maryland v. Buie*, 494 U.S. 325, 334 (1990). "Protective sweeps need not always occur in conjunction with an arrest" where "a reasonable officer could conclude that it was necessary for his safety to secure the premises before obtaining a warrant." *Id.*, *quoting United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006 (8th Cir. 2010).

Articulable facts warranted the agents' protective sweep. Agents went to Ortega-Montalvo's apartment after learning he was in the country illegally. From their briefing, they knew he had a prior conviction for aggravated assault on a police officer, and from Maldonado, they knew he may be present in the apartment. These facts were "sufficient to alert the agents as to the possibility that the apartment harbored dangerous individuals." *Id.*

Citing *United States v. Hassock*, Ortega-Montalvo argues the protective sweep was unreasonable because the agents used consent to gain entry and thereby created the exigent circumstances. ***United States v. Hassock***, 631 F.3d 79, 88 (2d Cir. 2011) ("[A] protective sweep is reasonable only to safeguard officers in the pursuit of an otherwise legitimate purpose. Where no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent, none of which were present here."). This argument is precluded by this court's decision in *United States v. Crisolis-Gonzalez*, 742 F.3d 830 (2014). There, agents received a tip that the defendant had entered the country illegally and was involved in meth trafficking. *Id.* at 833. Surveilling his apartment complex, they saw his car. *Id.* Two agents knocked on the apartment's door. *Id.* A man, not the defendant, answered and consented to the agents entering "to speak with him." *Id.* Once inside, the man indicated others were in the house, and the agents conducted a protective sweep for their safety. *Id.* at 833-34. This court held the protective sweep lawful. *Id.* at 836.

The district court did not err in finding the protective sweep lawful.

III.

Ortega-Montalvo maintains he did not voluntarily consent to the search of his bedroom.

The totality of the circumstances shows that Ortega-Montalvo did voluntarily consent. Like Maldonado, there is no evidence that Ortega-Montalvo's age, intelligence, or education inhibited his ability to voluntarily consent, nor is there any evidence he was intoxicated. Although he was under arrest, there is no evidence he was threatened or coerced by the agents or they made any promises or misrepresentations to him. *See United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998) (holding the district court did not err in finding consent where there was no "evidence of duress, intimidation, or over-reaching by the officers"). Similarly, the fact that he was not informed of his right to refuse consent does not, in itself, make consent involuntary. *United States v. Watson*, 423 U.S. 411, 425 (1976) (holding that the "failure to inform the arrestee that he could withhold consent" does not automatically make consent involuntary); *United States v. Zamoran-Coronel*, 231 F.3d 466, 469 (8th Cir. 2000) (considering the voluntariness of consent, the "relevant inquiry . . . is whether the officers did anything to affirmatively communicate to the defendant that [he] was not free to . . . refuse the consent request"). Finally, his criminal history suggests he would have been aware of his rights and protections. *See United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (finding consent voluntary "[a]lthough [defendant] was not read his *Miranda* rights prior to the search" partly because "he was experienced in the legal system and likely aware of his rights").

The district court properly found Ortega-Montalvo's consent voluntary.

IV.

Ortega-Montalvo requests suppression of "all evidence obtained as a result of the agents' unlawful entry into the apartment and the unlawful protective sweep." Because the agents had Maldonado's voluntary consent to enter the apartment, lawfully conducted the protective sweep, and had Ortega-Montalvo's voluntary consent to search his bedroom, this argument is without merit.

-8-

\* \* \* \* \* \* \*

The judgment is affirmed.

_____